

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-14-00118-CV

IN THE MATTER OF G.M.S.

----------

FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant G.M.S. appeals from a judgment for temporary court-ordered inpatient mental health services. In a single issue, G.M.S. challenges the legal and factual sufficiency of the evidence to support the trial court's findings. We reverse and render.

----

[1]*See* Tex. R. App. P. 47.4.

## I. Background

On April 2, 2014, the trial court found that G.M.S. was mentally ill and that as a result of his mental illness, G.M.S. will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress; continue to experience deterioration of his ability to function independently, which is exhibited by G.M.S.'s inability, except for reasons of indigence, to provide for his basic needs including food, clothing, health, or safety; and is unable to make a rational and informed decision as to whether or not to submit to treatment. The trial court ordered that G.M.S. be committed for court-ordered temporary mental health services at the North Texas State Hospital (NTSH) in Wichita Falls, Texas, for a period of time not to exceed ninety days. This appeal followed.

## II. Analysis

In his sole issue, G.M.S. argues that the evidence is legally and factually insufficient to support the trial court's findings that he, as a result of his mental illness, was experiencing a deterioration of his ability to function independently and was unable to make a rational and informed decision whether to submit to treatment. *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C)(ii), (iii) (West Supp. 2013).

### A. Health and Safety Code Section 574.034

A court may order a proposed patient to receive temporary inpatient mental health services only if the factfinder concludes from clear and convincing

evidence that the proposed patient is mentally ill and also meets at least one of the additional criteria set forth in section 574.034(a)(2):

> (2)    as a result of that mental illness the proposed patient:
>
>> (A)    is likely to cause serious harm to himself;
>>
>> (B)    is likely to cause serious harm to others; or
>>
>> (C)    is:
>>
>>> (i) suffering severe and abnormal mental, emotional, or physical distress;
>>>
>>> (ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and
>>>
>>> (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

Tex. Health & Safety Code Ann. § 574.034. Here, in addition to finding that G.M.S. is mentally ill, the trial court's order affirmatively found the State's allegations under subsection (2)(C) to be true.

## B.  The State's Burden

The evidentiary standards for involuntary commitment are high. *State ex rel. E.E.*, 224 S.W.3d 791, 794 (Tex. App.—Texarkana 2007, no pet.) (citing *Harris v. State*, 615 S.W.2d 330, 333 (Tex. Civ. App.—Fort Worth 1981, writ ref'd n.r.e.)). The State has the burden of establishing by clear and convincing evidence that the proposed patient meets at least one of the additional criteria

3

listed in section 574.034(a)(2). *Mezick v. State*, 920 S.W.2d 427, 430 (Tex. App.—Houston [1st Dist.] 1996, no writ). Clear and convincing evidence is that "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

As a general rule, when court-ordered temporary mental health services are sought under subsection (a), specific requirements for clear and convincing evidence are imposed: the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function. Tex. Health & Safety Code Ann. § 574.034(d). An expert diagnosis of mental illness, without more, is not sufficient to confine a patient for compulsory treatment. *Mezick*, 920 S.W.2d at 430. The State cannot meet its burden of proof without presenting evidence of the behavior of the proposed patient that provides the factual basis for the expert opinion. *See id.* Moreover, the recent overt act or continuing pattern of behavior shown by the State must also relate to the criterion on which the judgment is based. *J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

4

## C. Standards of Review

To review the legal sufficiency of the evidence where the burden of proof is clear and convincing evidence, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and must disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.*

In reviewing factual sufficiency challenges, we review all the evidence in the record, both in support of and contrary to the trial court's findings. *In re C.H.*, 89 S.W.3d 17, 27–29 (Tex. 2002). We must give due consideration to evidence the factfinder could reasonably have found to be clear and convincing. *Id.* at 25. Under the clear and convincing standard, we determine whether the evidence is such that the factfinder could reasonably form "a firm belief or conviction" as to the truth of the allegations sought to be established by the State. *Id.* We must consider whether disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. The trial court as the factfinder is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *In re Estate of Canales*, 837 S.W.2d 662, 669 (Tex. App.—San Antonio 1992, no writ).

5

**D. Sufficiency of the Evidence**

G.M.S. contends that the State failed to show by clear and convincing evidence that he was "experiencing substantial mental or physical deterioration of [his] ability to function independently, which is exhibited by [his] inability . . . to provide for [his] basic needs, including food, clothing, health, or safety" and that he was "unable to make a rational and informed decision as to whether or not to submit to treatment."[2]  *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C)(ii), (iii).  In order to meet its evidentiary burden under subsection (C)(ii), the State was required to bring forth expert testimony of either a recent overt act or a continuing pattern of behavior that tends to confirm the deterioration of his ability to function.  *See id.* § 574.034(d)(2); *J.M.*, 178 S.W.3d at 193 ("[T]he recent overt act or continuing pattern of behavior proven by the State must relate to the criterion on which the judgment is based.").

**1. The State's Evidence**

Dr. Diana Isachievici, M.D., the State's expert witness and G.M.S.'s treating psychiatrist at NTSH, was the only witness to testify at the hearing.  Dr. Isachievici was the admitting physician on March 17, 2014, when G.M.S. presented himself for treatment.[3]  At that time, G.M.S. reported that he had been

---

[2]G.M.S. does not challenge the evidence supporting the trial court's finding that he was suffering severe and abnormal mental, emotional, or physical distress.  *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C)(i).

[3]The trial court's file contains numerous documents detailing the events that led to these commitment proceedings after G.M.S. presented himself for

6

depressed and suicidal for several months. He also reported that he had been isolating himself, was having difficulty sleeping, had low energy levels, had feelings of guilt, and had lost a lot of weight. Dr. Isachievici diagnosed G.M.S. with major depressive disorder, which she defined as a form of mental illness characterized by depressed mood, low energy levels, difficulty sleeping, difficulty concentrating, memory problems, poor appetite, and suicidal ideations. Dr. Isachievici recommended mood-stabilizer and antidepressant medications and group and individual therapy for G.M.S.

Dr. Isachievici testified that G.M.S. was cooperating with his treatment, but he initially refused to take the medications. G.M.S. reluctantly began taking the medications two days before the hearing, but he was currently compliant in taking them. Dr. Isachievici expected the medications to reach maximum therapeutic levels in four to eight weeks. She stated that before he began taking the medications, G.M.S.'s affect had improved and he denied having any depressive symptoms or suicidal ideations. However, Dr. Isachievici thought that G.M.S. was trying to minimize his depressive symptoms so that he could be discharged.

---

treatment. Even though the trial court took judicial notice of the contents of its own file, it could not take judicial notice of the truth of any allegations contained in the file. *See State ex rel. K.H.*, No. 02-02-00301-CV, 2003 WL 21404821, at *2 (Tex. App.—Fort Worth June 19, 2003, no pet.) (mem. op.). Thus, we may consider only the evidence presented at the hearing in our review. *In re P.E.J.*, Nos. 02-13-00099-CV, 02-13-00100-CV, 2013 WL 4121081, at *3 n.3 (Tex. App.—Fort Worth Aug. 15, 2013, no pet.) (mem. op.) (citing *K.H.*, 2003 WL 21404821, at *2).

Dr. Isachievici believed G.M.S. had limited insight into his mental illness because when G.M.S. met with Dr. Charlene Shero, M.D. to complete a second certificate of medical examination for mental illness,[4] G.M.S. told Dr. Shero that there was no point in taking medications and that it was a person's right to decide whether to live or die. According to Dr. Isachievici, when she discussed these comments with G.M.S., he denied ever speaking with Dr. Shero. Even though G.M.S. made these statements to Dr. Shero, he denied having suicidal ideations, which caused Dr. Isachievici to think he was minimizing his symptoms. Based on this belief, Dr. Isachievici stated that it was a possibility that G.M.S. was likely to cause serious harm to himself.

When asked if G.M.S. had experienced any mental or physical deterioration of his ability to function independently and care for himself because of his depression, Dr. Isachievici responded: "Yes. He became very depressed and lost several pounds before the admission. He was also—so compliant with—on treatment for his diabetes which, of course, contributed to some of his mood symptoms, and he had those suicidal ideations with a plan to kill himself." Dr. Isachievici was also asked whether G.M.S. could make a rational and

---

[4]"A hearing on an application for court-ordered mental health services may not be held unless there are on file with the court at least two certificates of medical examination for mental illness completed by different physicians each of whom has examined the proposed patient during the preceding 30 days." Tex. Health & Safety Code Ann. § 574.009 (West 2010). Dr. Isachievici issued the first certificate of medical examination for mental illness on March 18, 2014. Dr. Shero issued the second on March 26, 2014.

informed decision about whether to submit to treatment. In response, she stated: "He's—he signed a consent for the medications and he started taking them. It is a like hood [sic] that he might not be compliant to the psychiatric medications, although he said I will do whatever but—but now he signed [a] consent and he's taking them." Dr. Isachievici thinks G.M.S.'s understanding as to why he needs to take the medications for his illness is limited, but she conceded that he signed a consent and was currently taking the medications.

Dr. Isachievici recommended that G.M.S. be temporarily committed for a period not to exceed ninety days, but she did not think he would be there for the entire ninety days. She admitted that G.M.S. could continue his treatment on an outpatient basis, but she was concerned that beginning antidepressant treatment might cause his suicidal ideations to increase. Because G.M.S. had only been on medication for two days, Dr. Isachievici stated that it was difficult to determine if G.M.S.'s suicidal ideations had increased. Dr. Isachievici further stated that she did not think outpatient treatment would be suitable for G.M.S. because she believed that he was minimizing his symptoms so that he could be discharged and that he did not have a stable family environment to which to return.

Without elaboration, Dr. Isachievici testified that it would not benefit G.M.S. to return to his family because "he doesn't have a stable environment he can return to. There is a lot of stress going on in the family right now." She also testified that there was a "higher level of dispute and distress" in G.M.S.'s family than in a typical family. Dr. Isachievici initially planned to discharge G.M.S. to

9

live with his father, but according to Dr. Isachievici, G.M.S.'s father did not want G.M.S. living in his home because of G.M.S.'s medical problems.

Dr. Isachievici admitted that she had planned to release G.M.S. two days prior to the hearing, but she decided against it after discussions with G.M.S.'s family members and because of Dr. Shero's certificate of medical examination. Dr. Isachievici conceded that even though G.M.S. might not be able to live with his father, G.M.S. was able to work and provide for himself financially. She also conceded that G.M.S. was not required to return to his family and that as an adult, G.M.S. was responsible for finding a place to live. However, according to Dr. Isachievici, it was NTSH's responsibility to know where a patient is going after discharge.

### 2. Sufficiency Analysis

G.M.S. does not challenge the trial court's finding that he is mentally ill. *See* Tex. Health & Safety Code Ann. § 574.034(a)(1). However, evidence of G.M.S.'s mental illness alone does not establish that he was experiencing substantial mental or physical deterioration of his ability to function independently exhibited by his failure to provide for his basic needs. *See Armstrong v. State*, 190 S.W.3d 246, 252 (Tex. App.—Houston [1st Dist.] 2006, no pet.). In addition to proof by clear and convincing evidence that the proposed patient is mentally ill, the health and safety code requires proof by clear and convincing evidence that the proposed patient's mental illness caused him to experience a substantial mental or physical deterioration in his ability to function independently, which is

10

shown by the proposed patient's inability, except for reasons of indigence, to provide for his basic needs. *See* Tex. Health & Safety Code Ann. § 574.034(a)(1), (a)(2)(C)(ii). "Moreover, evidence of the effects of mental illness does not necessarily establish evidence of *substantial* mental or physical deterioration unless the effects impair a person's ability to function independently to provide for basic needs." *Armstrong*, 190 S.W.3d at 252.

Even though G.M.S. initially refused to take his medication, his refusal to take his medication is legally insufficient evidence of an overt act or continuing pattern that demonstrates his distress or a deterioration of his ability to function. *See State ex rel. E.R.*, 287 S.W.3d 297, 306 (Tex. App.—Texarkana 2009, no pet.) ("Evidence of refusal to take medication, alone, is not an overt act or continuing pattern of behavior tending to confirm a proposed patient's distress or a deterioration of the ability to function."). Dr. Isachievici pointed to G.M.S.'s suicidal thoughts, depressed mood, and weight loss as evidence of deterioration of G.M.S.'s ability to function independently and care for himself. These behaviors may be symptoms of mental illness, as are self-isolation, difficulty sleeping, low energy levels, and feelings of guilt, but the State did not present any evidence showing how these symptoms tended to confirm the deterioration of G.M.S.'s ability to function independently as exhibited by his inability to provide for his own needs. There was no testimony that G.M.S.'s mental illness prevented him from providing for his basic needs, including food, clothing, health, or safety.

11

We note that G.M.S.'s suicidal ideations are concerning. But Dr. Isachievici offered no testimony regarding a specific plan to commit suicide or a suicide threat or attempt by G.M.S. to establish a recent overt act or continuing pattern of behavior that tended to confirm a deterioration in G.M.S.'s ability to function. Moreover, as the trial court did not find that G.M.S. was likely to cause harm to himself, this evidence does not support the order of commitment.

In summary, the State failed to introduce clear and convincing evidence of an overt act or continuing pattern of behavior that tended to confirm a deterioration of G.M.S.'s ability to function. Therefore, viewing the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could not have formed a firm belief or conviction that this finding was true. *See J.F.C.*, 96 S.W.3d at 266. Consequently, the evidence is legally insufficient to support the trial court's finding under health and safety code section 574.034(a)(2)(C)(ii). *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C)(ii), (d). Because the evidence is legally insufficient to support the trial court's finding under section 574.034(a)(2)(C)(ii), we need not address the remainder of G.M.S.'s legal sufficiency complaint or his factual sufficiency complaints. *See* Tex. R. App. P. 47.1. Accordingly, we sustain G.M.S.'s sole issue.

### III.  Conclusion

Having sustained G.M.S.'s only issue, we reverse the trial court's judgment and render judgment denying the State's application for temporary court-ordered mental health services.  *See* Tex. R. App. P. 43.2(c).

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and MCCOY, JJ.

DELIVERED:  June 12, 2014